Good morning. Judge Garris and I are particularly happy to be in Newark for obvious reasons and we are very, very happy to welcome Judge Cohill, who is sitting with us this morning. Those of you who are familiar with the work of the Court of Appeals know how relentless it is and we are always understaffed and overwhelmed and if it were not for the help we receive from visiting judges, I don't know that we could move as many cases as we do, thousands a year. But to have someone of the reputation and ability of Judge Cohill is something for which we are very grateful and I welcome him most warmly. And there is a second matter of preliminary business. There is a motion to admit Brendan Walsh to the bar of this court. I know Mr. Walsh, I hope that is not disqualifying. Mr. Walsh left in early September, having served as my law clerk last year and he had been a law clerk for Judge Katherine Hayden before that. He was a graduate of Seton Hall Law School and right at the top of his class. And I tell you, having just started my 26th year on the federal bench and having thought during the last few weeks, more than I usually do, about all the law clerks that I have had and how blessed I have been, Brendan is right among the very, very top of the heap. He was a remarkable law clerk. He knows, this is an insight, he knows he won the award for being the most stubborn law clerk I have ever had. But he is a great credit to me and it is not just a privilege, it is indeed an honor to make the motion to admit him to the bar of this court. I would assume my brothers here have no objection? No objection. Let's see how easy it is. Thank you. Will the clerk administer the oath, please? Congratulations. Thank you. And all good luck, Brendan. It's still more fun in the district court, though. We'll hear argument in Garlic v. Quest Diagnosis. Good morning, may it please the court. I'd like to reserve three minutes for rebuttal, if that's possible. Would you identify your name for the record? Yes, Norman Perlberger, attorney for the plaintiffs. Yes, three minutes.    Thank you. Thank you. Thank you. Thank you. Thank you. First of all, I want to thank the court for allowing an oral argument because I know that that's not always the case and I trust that the complexity and the first impression of this case is one that is of significance to this court in determining a case of this importance. This case arises from a motion that was granted by Judge Kavanaugh, district court judge, against the lab companies as well as the third-party administrators who administer a test to determine the presence of a metabolite of alcohol called ETG. Interestingly enough, Judge Kavanaugh states very clearly that his decision is based upon two things. One, that the plaintiff conceded that ETG was found in the urine. So this metabolite was found in the urine. There's no question about that. And secondly, he says that because there is no allegation that the sample was mishandled, that there was any contamination, or that there was any improper performance of the test, that that's dispositive. He looked at the cases that existed throughout the country and determined that unless you met those factual underpinnings, you have no right to bring a negligence case to court. Well, let's just put that to rest for a moment. If this case were simply about lab defendants, people who worked at a lab and analyzed the specimens and came to a conclusion which is not disputed, nor is there any suggestion that the specimen was tainted or mishandled, and no one is suggesting that the result was incorrect, that's your typical lab defendant case. There was a duty to use reasonable care. Reasonable care was used against that in that. But here your problem is it goes beyond that, doesn't it? Yes, it does. And it goes into the selection of the baseline. The selection of the baseline and the way this test was marketed. I would respectfully submit that. But, you see, this is where your complaint is giving me problems, and I speak only for myself. Everything is lumped together in the complaint. You've got a very long complaint with allegations against the lab defendants and the TPA defendants, and it's all against a defendant, and I don't know who is alleged to have done what. Who chooses the baseline, for example? And how can it be determined whether the result over the baseline is due to alcohol or some other cause? Those are the questions that we need to ask, and I don't even know who would have responsibility for doing either one based on this complaint. And your Honor is really honing in on it. I think that these are all factual determinations. The allegations which have to be taken as true. Allegations against whom or whom, I forgot. I knew that in practice. I understand. We've alleged that the lab companies, which are the first four defendants, promoted this product as a gold standard, as an infallible standard. Once you get a result above whatever cutoff is determined, it means that there's alcohol consumption of a beverage. They said that that test has blazed new ground, and it would be negligence for them not to utilize this test. Has this ever been reviewed by a government agency? Yes. The Food and Drug Administration? Absolutely. The FDA? No, this is not subject to the FDA, but there is an agency, SAMHSA, which is the Substance Abuse Agency to Federal Government, that in fact issued a black box warning that's mentioned in my brief. It's on page 19. They've done an investigation of this test and the cutoffs that are determined as determining the presence of alcohol beverage. And they clearly say in their black box warning, which I'll read in part to you, the use of an ETG test in determining abstinence lacks sufficient proven specificity for use as primary or sole evidence that an individual prohibited from drinking in a criminal justice or a regulatory compliance context has truly been drinking. Legal or disciplinary action based solely on a positive ETG discussed in this advisory is inappropriate and scientifically unsupportable at this time. And that is really because the baseline is too low. I think that's probably what we can fairly say. Yes or no? I think that's true because what they determined and what has been known by the defendants, and I say all of these defendants, absolutely without question, all of these defendants are totally aware that there are substances in the marketplace, over 400 that are listed, including such things as Ben and Jerry's ice cream and sanitizing, all kinds of substances that are used which will result in a positive ETG test, which will result in levels that Dr. Skipper, who introduced this test in the United States, says are false positives. Now the industry has known that. It's not a false positive, though, because you're testing not for alcohol. You're testing for ETG. So it's a positive. What I mean by false positive is that these defendants go further. They don't just say this is the result. As we allege in our complaint and as we can prove by the documentary evidence that we're going to have a trial, when they report their results, they interpret their results. They say that this finding is consistent with and indicative of an alcoholic beverage consumption. They interpret the test. The TPAs... Well, it could be. No, they don't say could be. They do not say could be. They say it does. The TPAs... Who's they? Here, we're going right back to the question you haven't answered. Those are the lab companies. Those are the four lab companies. The lab companies. Yes, they report the results. They report the results. They don't just report the figure. That's correct. You know, 600, whatever you call them. That's correct. And we allege that in our complaint. They go further than that. They interpret the results. So what does the MRO do? Okay. So the MRO is supposed to, from a regulatory standpoint, is supposed to then interview the subject, look at documentation, try to determine whether there are other reasons why this reading may have come up through some kind of a substance that was ingested or to which they were exposed. They're supposed to do an investigation, and they have regulatory requirements to do that, and then they're supposed to report to the licensing boards whether, in their opinion, these test results are as a result of alcohol, beverage consumption. And you're alleging that they acted negligently as well, I guess. Absolutely. Is that paragraph on page 23, paragraph I, I was trying to discern where exactly you allege that. It would be paragraphs 89 to 93. All right. Well, I'm sorry. Paragraph 93I, I thought that might have been. Yes, that is it. Now, isn't that basically a mishandling? No, it is not because it's an interpretation. The mishandling cases deal with you take the urine sample and somehow it gets contaminated, it gets mislabeled. You do something that causes the result to be skewed. This is not a skewed result. This is an interpretation of a result. Well, let's go right back. Paragraph 93, defendants. Who did what when? That's not parsed in this complaint. It is if you take the incorporated paragraphs. The paragraphs that are incorporated, and there's a lot of detail in these paragraphs, tell us exactly what these MROs did. Okay. Who chooses the baseline? The lab defendants? The labs do. Okay. How can it be determined whether the result over the baseline was due to alcohol or some other cause? Well, according to Dr. Skipper, you can't. Once it gets above a certain level. You cannot determine. So how can. And that's according to the agency that oversees it. So how can then they comply with a duty to avoid erroneous results? Well, first of all. I think you've just told me they can't. Right. If you believe Skipper. Right. So first of all, they should not be stating in the results that this finding is as a result of an alcoholic beverage consumption. That's what they say in their sales literature, in their promotional literature, and in the reporting of the results. The result itself, the sheet that comes out by these companies says, this level shows alcohol beverage consumption. Now, the MRO then investigates, and I put that in quotes, because the testimony we have from our plaintiffs is that that investigation is sometimes a five-minute telephone call. It says, do you have any reason why you think these results are the way they are? And then what happens is these people, Dr. Margaret Brown at Compass Vision, Dr. Barnshaw at First Lab, these people have testified in proceedings, in disciplinary proceedings, that as far as they're concerned, these cutoff levels are accurate and that this is a sign of alcohol consumption. Now, the licensing boards are relying on this. The defendants argue that, well, there's no privity, that's not who hired them. Well, what's accurate? You've got three different baselines used here as part of this alleged complaint, 100, 250, and 500. I mean, so what's accurate, 100? None of them. None of them. That's correct. None of them are correct. According to Dr. Skipper, anything under 2,000. No, but they're saying they're accurate. Excuse me? They, defendants, are saying they are accurate. Based on what? I don't know, Dr. Skipper. Well, that's the point. I'll tell you why they're doing that, Your Honor. Let me explain the test. This test, the reason it's such a tremendous test from a cash flow standpoint, it's a $4 billion industry, they tout this test as being able to identify this metabolite five days out. In other words, you drink an alcoholic beverage five days out, they're going to determine this. Now, five days out, the results are going to be less on a milliliter result, five days out than one day out, than one hour out. So they determined that by these low levels, they can prove that there was an alcohol beverage consumption even five days out. Now, that's what makes this test so marketable, because breathalyzer tests don't do this. Other blood tests don't do this. So they have touted this as the gold standard, that these levels, as low as they are, are conclusive evidence of that. Now, Judge Kavanaugh failed to do a duty analysis. He did no duty analysis whatsoever. Well, he did. He did a limited duty analysis. I would respectfully suggest that he didn't even do that. What he did was he said that he has reviewed the cases, and these lab cases, which Your Honor pointed out right away, are ones that are missing from these facts, and therefore there can't be any duty. There can't be any duty. A sweeping statement, which the courts that have reviewed this since then, and I've provided the court by letter and with attachments, I don't know whether Your Honors have it, but the decision out of Pennsylvania and three decisions out of California, where trial court judges have dismissed that, where they've even looked at this decision, the garlic decision, and have said that it's absolutely unpersuasive, that the judge did not do a duty analysis. This is a first impression case, and yet the defendants in this brief say it is not. It's standard run-of-the-mill case that falls within all these cases, and yet in their California briefs they admit that it's a first impression case. Your Honor, these defendants, and I emphasize them as a group because they act in tandem with each other. They are making money off of this industry this way. These defendants are acting like manufacturers. They are tantamount to manufacturers of product. Let's go back to the issues before. Judge Chigarro's question. It's more of a housekeeping issue. It's a little confusing, I think you'll have to admit. In your opening brief you say, if we have a chance to amend, we'll do this, this, and this. Appellees come back and kind of call you on it. What's your position now? Do you want the ability to amend or not? In the footnote in my reply brief, my partner looked at the cases and we conceived that those cases were civil rights cases. However, there's language in that case that's mentioned in the footnote that says that there shouldn't be a different standard when you apply to civil rights cases. It should be the same pleading standard that applies to all federal cases. We're beating up on you pretty well. It's unusual to see a 12b6 motion granted with prejudice. And I agree, Your Honor. You would think that manifest justice would say, let the person amend. We thought our complaint was more than adequate under federal notice pleading. We have all these allegations that are in here as well as documents to support it. We were shocked that it was dismissed with prejudice. So we asked for amendment. It may not be a matter of abuse of discretion. You did not ask for amendment? No, no, I'm talking about in our brief. Now look, let's go back. The duty you allege here is a duty to use a reasonable degree of care to avoid erroneous test results, correct? In the reporting or interpretation of those reports. No, no, please. The duty you specify in your complaint in paragraph 55 is the duty to use a reasonable degree of care to avoid erroneous test results. That's correct. Now, what would each group of defendants have to do to avoid erroneous test results? Or is it just as simple as having whoever's in charge of raising the baseline raise the baseline? If they raise the baseline, they'd be out of business. But that's not answering my question. Well, I'm sorry. What I'm suggesting is that they have a duty to raise that baseline in the face of the black box warning, in the face of Dr. Skipper's warning. Incidentally, isn't it a gray box warning? You said black box a lot. Isn't it gray box? Perhaps you're right. Perhaps you're right. Black box is more into prescription drugs. Okay. So this, the warning. Is that the only way that erroneous test results could be avoided by these defendants? They should all, well. Yes or no? As to the labs. As to what? But they should not be saying that this is an alcohol beverage consumption by virtue of this test. They are interpreting the result. We are way over your time. We'll get you back. All right. Thank you. Thank you. Ms. Caldwell. May peace accord. We'd like to split it such that I, representing the laboratories, would have ten minutes and my colleague for the TPAs would have five, if that's all right. I'm appearing today on behalf of the three defendant appellees for drug testing laboratories. My name is Faye Caldwell. Welcome to Caldwell and Clinton. The three laboratories are my client, LabOne, Inc., incorrectly named as Quest Diagnostics, Laboratory Corporation of America, and National Medical Services. The testing laboratories are alleged to have analyzed and reported the results of the ETG test. The appellants do not allege that the laboratories had any individualized contact with the appellants and did not take any individualized action other than correctly reporting the results. They do not allege that they took any employment action nor were they decision makers with their licensing status. As this court has noted, it is undisputed that the analytical results were accurate and correct in what they reported. Instead, I think appellants are making the argument that unlike the sort of, I'm going to call it, testing and collection cases, which they cite in their brief, this is a different view. This is an issue about negligent marketing, negligent promotion. In short, negligent statements made to third parties, not to appellants. If you will, negligent misrepresentations made to third parties. As a result of which, people lose their jobs. That's the allegation. However, negligent misrepresentation is not before this court. No, it's only count five negligents. It's the only count before us. But the factual underpinnings are negligent misrepresentations by claims made to third parties. The lab defendants believe this issue has actually been looked at around the country for very analogous facts. We would point to probably the most comprehensive study of it and this is Smith-Pine v. Doe case out of the Texas Supreme Court, in which case the laboratory, prior to doing this individual's test, had made statements pouting the test, doubting it as positive certainty of drug use, somewhat analogous to the allegations in this complaint. Again, the test was seen as factually correct. And the issue was very similar to this case. What do you do with a result, a cutoff that had been set by laboratories and or the clients, that did not distinguish between innocent consumption of coffee seeds and heroin or morphine use? There's been a series of the cases all cited in our brief around the country on this exact issue, and we think this is the case law that is applicable to the facts in front of this court. Well, let me tell you something. I separate it apart from whether the complaint is well-played or not or whether there's a Cavanaugh error or McNair. I think this case presents a serious issue. Perhaps not this case, but the serious issue is presented by this test. This test is marketed to health care professionals, people who work in hospitals, people who work in nursing homes, people who are recovering alcoholics and have to test clean to maintain their jobs. Now, I know the test doesn't test for alcohol. It tests for ETG, and the positive result is a correct result, by virtue in about, what, 10% of the cases, allegedly because of hand sanitizer and things of that nature, mouthwash, and people lose their jobs. Now, I think what I'm being told by your friend across the aisle, that's because the baseline is so low, and the anecdotal evidence of Ms. Garlick being in a cocoon for X number of days and using nothing but hand sanitizer, obviously no alcohol, but hand sanitizer, and testing positive. I think the level of baseline is 700 to test it. There's something wrong about that. We would urge that this is not marketed to health care professionals. This test is marketed to state boards, and certainly they have resources and clinical correlation. You know what I'm saying. That is the allegation, which obviously for this purpose I accept is true. We would point out that this issue, in the terms of poppy seeds, has come up, and really for people who were randomly chosen, who had no drug history, and, of course, the allegation in those cases is that they also lost their jobs. We're talking about a duty in this case. Why shouldn't your client owe the appellants a duty here? Really, because of the policy arguments. My clients don't have any relationship. They have no ability to determine, is this innocent usage? Is it alcohol consumption? See, that was one of my early questions. How does one assure that an accurate result is being obtained? And I don't know what the answer is. The only answer is to raise the baseline. Well, obviously, if you raise the baseline, you have less detection when you don't, according to, again, taking what is said in the complaint. Yeah, but one drink puts you off at, what, 5,000? So that, I mean, even the inventor of this, or the one who was instrumental in inventing this test, said it should be 2,000. So if one drink is going to take you way beyond that, I mean, why not raise it to 2,000? Well, the problem is, Your Honor, is it's a matter of time. While a person may go to 5,000 an hour after a drink, they would be well, well under that within 12 hours. So they might be at 1 to 200 or 500. So it's a matter of time because it decreases over time. So it wouldn't solve the problem, Your Honor, which is why, as even the gray box morning said, it should not be based solely on it, which is why these reports don't go. If it can't be based solely on it, what else can it be based on? This test plus what? We would assume the state boards are also looking at clinical evidence interviews. We don't know because the labs are not part of it. But what the gray box morning said, it should not be based solely. And so the people to whom this is marketed also have the ability to do interviews, to go to whatever programs that they insist these people follow. They're in the best position, frankly, to determine whether or not. But is that the way you market your product, though? Don't rely on us. You ought to be doing something different. We would – I would say that we do not. We do understand we have to accept it's true, the allegations. Right. Okay. But, no, I would not agree that that's the way it's marketed. But let's assume just for argument's purposes that there should be some remedy for those 10% of people who are being discharged when, let's assume, there was no usage of alcohol. Should that be coming from the national level through one of the drug agencies? I think it probably should come from the state boards because these are individual state entities that are monitoring and dealing with these people. And the state, as I understand it, the state varies from state to state of what the standards are, what they ask people to comply with. So maybe the plaintiffs should be suing the state boards, but then there'd be some sort of a jurisdictional problem, undoubtedly. We think the cases that are applicable here, the courts that have looked at this, are really the poppy seed cases which have looked at exactly an allegation. And they've chosen not to extend, since the labs have no contact with these people, they are not in the best position to determine whether it's innocent usage or not. I understand that's the allegation. Let me ask, I don't think this question has been answered, though I've asked it three times. Which group of defendants set the baseline? The state boards select the cutoff. The state boards, so they're not even defendants? There might be a variety of what, but no. The state boards select the cutoff. And it varies from state to state. Is there a contractual relationship between the labs and the various people that sell this stuff? As I understand it, the laboratories have contractual relations with the third-party administrators, who I understand then have contracts with the state boards. So that these defendants have no ability to change the baseline? These defendants, the lab defendants. They could refuse to offer it, but the state boards are the ones who select. So that how can, if the state board selects the baseline, how would these defendants have a duty to assure accurate results other than in compliance with the baseline? That's all they can do, and give a quantitation if asked for, and allow them to make a determination at the state board level what this means to do other work. That's why the gray box warning says don't rely solely on this, because there could be clinical. That's one of the reasons in the Smith-Klein-Verdot case that the court held that it was not the appropriate party to hold responsible for the interpretation is the one who's making the decisions, not the one who reports it. I'm out of time. I'd like to have my colleague, Lou, urge that we think that Judge Kavanaugh may do a correct duty analysis given the amount of involvement that the laboratories have. And I thank you for your attention. Thank you. May it please the court. My name is Todd Schleifstein. I'm at Greenberg-Trarig, and I'm here today on behalf of the so-called TPA defendants, which is my client, First Advantage Occupational Health Services Corporation, as well as First Hospital Labs and Compass Vision, Inc. The TPA defendants are alleged in this complaint to have administered the ETG tests at issue and to have reported the results back to the state boards. All of the arguments that Ms. Caldwell presented with respect to the lack of duty on behalf of the lab, the testing lab defendants, really apply with full force and effect to the TPA defendants as well, but I did want an opportunity to make a few additional points. There is really no viable negligence claim here against the TPA defendants because there's no logical basis for the imposition of a duty. The duties that the TPA defendants owe are a contractual duty of performance and a duty to accurately administer and report back the test results. Both of those duties are owed to their clients. Well, that's the duty you say it should be. Correct. But your friend across the aisle, for purposes of this case, has alleged a different duty. That's correct, Your Honor, but there's really no foundation in the law. There's no opinion in any of the six state supreme courts or any of the lower courts in those jurisdictions suggesting that those state supreme courts would impose such a duty because, much like the lab defendants, the TPA defendants are strangers to the relationship between the plaintiffs and the state testing boards. Counsel, in the complaint, paragraph, I believe it's 93, there's an allegation that seems unique to your clients, and that is that the evidence, there was incompetent, inadequate, and cursory review by the MROs. Isn't that more akin to the sort of mishandling cases than the other types of cases that have been discussed here in terms of marketing? Well, Your Honor, I would respectfully say it's not. The MROs, and again, there's no description of what they do in the complaint. It does vary by defendant. In fact, we have to take the allegation as true, even though my client, First Advantage, doesn't even offer MRO services. But in that case, what they're doing is they're sitting down, they're reviewing the results, they're placing a phone call to the plaintiff and saying, look, you're above this level, what do you have to say? And then they're reporting that back to the boards. At the end of the day, the boards are the ones that set the baseline. The boards are the ones that determine the significance of the fact that the baseline has been found in the urine. And most importantly, the boards are the ones that chose whether to impose further discipline on any of the plaintiffs or not. These are all activities that the TPA defendants are completely uninvolved with and have absolutely no control of whatsoever because they have a contractual duty to administer. And the rest of this, whether they're providing MRO services or not, are really beyond what they're being paid to do. So you're saying that the remedy, if any, ought to be the talents against the state boards? I would say carefully, if any, Your Honor, because I don't believe there's a claim against the state boards either here. But if anything, the state boards... Why am I not surprised when you say that? Well, Your Honor, I don't want to throw anyone under the bus today if I can. But really, what we should focus on is the fact that, as Ms. Caldwell said, the state boards are really in the best position to make this decision. You're balancing two important policies here. On the one hand, you have individuals that want to be given a second chance not to lose their jobs, or frankly, in some cases, a third or fourth chance. And on the other hand, you have public policy interests to protect the public from people being treated by impaired medical professionals who don't have control over their alcohol or drug addiction. Your Honor, the TPAs really shouldn't be making that decision. The boards are really doctors testing doctors. You couldn't find a more sophisticated audience. The boards were the parties that wanted the ETG test, insisted on the ETG test. At the end of the day, they can read as well. They still want to do it because it's their determination that this is the appropriate way to balance those two competing interests. Again, what plaintiffs would like to do here is impose a duty on the TPAs to further investigate beyond what minimal review already occurs at the minimal level, then to go to the boards as their advocate and say, wait a minute, we hear reports out there in the press that this isn't the greatest test. Even if they did that, Your Honor, at the end of the day, it's still up to the boards what this all means. The boards are the ones who could decide to describe it all the way in the world to consider it partially rather than solely or to not consider it at all. I see I'm out of time, and unless Your Honors have further questions, I'm happy to pass the microphone. I think I am correct when I say in spite of the use of the phrase throughout the papers, this is not a false positive case. That's right, Your Honor. The baselines were set, and in each of the cases there's no dispute that the baseline level was met in the lab results for each of these named plaintiffs. Because they weren't testing for alcohol. We were testing for ETG. That's correct, Your Honor. Thank you. Thank you, Your Honor. In rebuttal, first of all, let me say that counsel for the TPAs has suggested to this court that the only way they could be held liable is if you establish a contractual privity. That's what he's basically saying. If you read through it all, he says they are strangers to the relationship. They're not strangers to the relationship. In fact, the cases we cited in our brief indicate that it's a virtual certainty. It's totally foreseeable that when they publish these results and they interpret these results and they give these results that overlay that this is caused by alcohol consumption, it's totally foreseeable that the intended victims are the people who are going to lose their licenses. And that's what all the judges have said in these cases that have looked at this, Judge Benitez, Judge Zimmerman, Judge Burton, and even in the Sharp case in Pennsylvania, it says these are virtual certainty outcomes. I want to dispute two things that counsel has suggested to this court. One is that the boards are establishing these limits. That is not what the evidence will show. What the evidence will show is that... Wait, forget that. Who is establishing the limits? Forget that. The labs are establishing the limits. They then tell the boards that these limits are the ones that establish an alcohol beverage consumption. The boards then rely upon that. I would imagine an employer can decide whichever lab he or she wants to go to. No, it doesn't. No? There's contractual relationships between Quest or any of these labs and the MRO and the board. In other words, it's a captive audience. For instance, in California, Compass Vision is the only MRO. So you're saying the state boards do not set the baseline. They do not set the baseline. The baseline is set by the labs. The labs convince the state boards that that's what alcohol consumption is. And when they say, when counsel says that the boards have doctors that are very apt at looking at this information, that's not what they do. They delegate this. These are just people who are reviewing license applications. They delegate this to the TPA that has medical review officers. Those medical review officers are established by the Code of Federal Regulations as required in these types of matters. Well, you know, your adversary just said some of the TPAs don't even have MROs. I'd like them to prove that. I mean, you know, if that's true, then I'll bet you they hire somebody as an agent of their TPA. In other words, there is a – That's why this – and I'm not going to get into that because the time is just about over. That's why this becomes even more unwieldy as a class action. Well, I would suggest there's different ways of dealing with – that's not a motion to dismiss. I would suggest that on a class action issue, there can be – the legal issues can be ferreted out. There can be issues that are common to all of the plaintiffs, and then you can have individual suits. And you've got all kinds of state laws applying. And that would be true of any national class. And you've got all different levels being applied in different states. I don't know. Anyway, that's for another day perhaps. You said that the labs set the limits. Do the TPAs have anything to do with setting the limits? No. The TPAs do the clinical investigation that counsel suggests happens here. If, however, that clinical investigation is simply, as counsel said, they call the plaintiff and say, well, you know, you had these levels that are above it. Like, what can you say? And then they tell the licensing board that they did their job, that they discharged their duty, and they acted as medical review officers and that we agree that this is alcohol consumption. That is negligence. That's negligence in the way they handle that layer that's supposed to be an added protection to the plaintiffs. The plaintiffs are supposed to have these layers of protection that just simply do not exist in this industry. That's what we allege and that's what we believe. Well, thank you very much. This case is well argued. We will take it under advice. Thank you very much.